**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE STATE OF MARYLAND, and ANTHONY G. BROWN, Attorney General of the State of Maryland, in his official capacity, | * | Case No. 1:26-cv-02719-MJM |
| | * | |
| | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    I.    Federalism Principles and the Anticommandeering Doctrine ....................................... 3

    II.    Laws Governing Federal Civil Immigration Enforcement ............................................. 5

    III.    Maryland's Community Trust Act ......................................................................... 7

    IV.    This Lawsuit ...........................................................................................................11

LEGAL STANDARD ...........................................................................................................11

ARGUMENT ...................................................................................................................... 12

    I.    The Community Trust Act Is Not Preempted by Federal Law. ................................... 12

        A.    No Federal Law Expressly Preempts the Community Trust Act. ................................ 12

           1.    Sections 1373 and 1644 Are Not Valid Preemption Provisions. .............................. 13

           2.    In Any Event, the Community Trust Act Does Not Conflict with Sections 1373 and 1644. ...................................................................................................................... 15

        B.    The Community Trust Act is Not an Unconstitutional Obstacle to Federal Immigration Enforcement. ....................................................................................................... 18

    II.    The Community Trust Act Does Not Violate Principles of Intergovernmental Immunity. ........................................................................................................................ 23

        A.    The Community Trust Act Does Not Directly Regulate the Federal Government. ..... 24

        B.    The Community Trust Act Does Not Unconstitutionally Discriminate Against the Federal Government. ..................................................................................................... 26

CONCLUSION.................................................................................................................... 30

i

## TABLE OF AUTHORITIES

### Cases

*Abel v. United States*, 362 U.S. 217 (1960)............................................................... 6

*Am. Petroleum Inst. v. Cooper*, 718 F.3d 347 (4th Cir. 2013)........................................ 17

*Arizona v. United States*, 567 U.S. 387 (2012) ..................................................... passim

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)........................................ 4, 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................11

*Blatchford v. Native Vill. of Noatak*, 501 U.S. 775 (1991)............................................... 3

*Buchanan v. Warley*, 245 U.S. 60 (1917)...................................................... 21

*Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011)................................................. 19

*Chappell v. S. Md. Hosp.*, 320 Md. 483 (1990) ................................................ 18

*City of El Cenizo, Texas v. Texas*, 890 F.3d 164 (5th Cir. 2018) ..................................................... 21

*Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020) ................................................ 15, 18

*CoreCivic, Inc. v. Gov'r of New Jersey*, 145 F.4th 315 (3d 2025)................................................. 24

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)........................................ 19

*Davis v. Mich. Dept. of Treas.*, 489 U.S. 803 (1989) .................................................. 29

*Dawson v. Steager*, 586 U.S. 171 (2019).............................................................. 27, 29

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997) ................................ 3

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990).............................................................. 4

*Ensminger v. Comm'r of Internal Revenue*, 610 F.2d 189 (4th Cir. 1979) ................................. 22

*Fed. Maritime Com'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002) ........................................... 3

*GenBioPro, Inc. v. Raynes*, 144 F.4th 258 (4th Cir. 2025)........................................ 4, 22

*Geo Grp., Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025)................................................. 23

ii

*Gregory v. Ashcroft*, 501 U.S. 452 (1991).................................................................................. 3

*Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328 (4th Cir. 2023) ........................................... 4

*Guzman v. Acuarius Night Club LLC*, 167 F.4th 217 (4th Cir. 2026).............................................11

*H&R Block E. Enters. v. Raskin*, 591 F.3d 718 (4th Cir. 2010) ...................................... 19

*Hancock v. Train*, 426 U.S. 167 (1976) ....................................................................... 24

*Johnson v. Maryland*, 254 U.S. 51 (1920) .............................................................. 24, 25

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) ...................................... 19

*Lawrence v. State*, 475 Md. 384 (2021) ....................................................................... 17

*Lockshin v. Semsker*, 412 Md. 257 (2010) .................................................................. 16

*Lopez-Lopez v. Cnty. of Allegan*, 321 F. Supp. 3d 794 (W.D. Mich. 2018) ..................................... 6

*McCulloch v. Maryland*, 17 U.S. 316 (1819)................................................................ 28

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) .................................... 25, 26, 27, 29

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)............................................ passim

*N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472 (4th Cir. 2025) .................................. 3, 19

*New York v. United States*, 505 U.S. 144 (1992)................................................... 5, 13, 14

*North Dakota v. United States*, 495 U.S. 423 (1990)................................... 23, 24, 26, 28

*Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750 (9th Cir. 2025) ........................................... 27

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of the State of N.J.*, 8 F.4th 176 (3d Cir. 2021) ......... 14

*Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261 (1943).................................... 24

*Printz v. United States*, 521 U.S. 898 (1997) ......................................................... passim

*S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584 (4th Cir. 2002)............................................ 4

*Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024) .......................................... 25

*Toler v. Motor Vehicle Admin.*, 373 Md. 214 (2003)...................................................... 17

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ..................................................... passim

*United States v. Colorado*, --- F. Supp. 3d ----, 2026 WL 878882 (D. Colo. Mar. 31, 2026) ......... 2

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) .................................... 2, 14, 26, 29

*United States v. Minnesota*, --- F. Supp. 3d ----, 2026 WL 2085701
   (D. Minn. July 20, 2026)..................................................................................... 2, 21, 30

*United States v. New Jersey*, No. 20-1364 (FLW) (TJB), 2021 WL 252270
   (D.N.J. Jan. 26, 2021) ..................................................................................................... 2

*United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025) .................................... 7, 21, 26

*United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025) .................................... 2, 15, 16

*United States v. Washington*, 596 U.S. 832 (2022) .................................................................. 23, 27

*Washington v. United States*, 460 U.S. 536 (1983) ........................................................................ 23

**Constitutional Provisions**

U.S. Const., art. I; § 8, cl. 4............................................................................................................ 5

U.S. Const. art. VI, cl. 2.................................................................................................................. 4

U.S. Const. amend. X................................................................................................................. 1, 3

**Statutes**

6 U.S.C. § 211 ................................................................................................................................. 5

6 U.S.C. § 252................................................................................................................................. 5

8 U.S.C. § 1101 .............................................................................................................................. 5

8 U.S.C. § 1182 ............................................................................................................................ 19

8 U.S.C. § 1226............................................................................................................................ 19

8 U.S.C. § 1231............................................................................................................................ 19

8 U.S.C. § 1325............................................................................................................................. 5

8 U.S.C. § 1357................................................................................................................. 5, 6, 19, 21

8 U.S.C. § 1373 ................................................................................................ 6, 7, 14, 15

8 U.S.C. § 1644 ...................................................................................................... 7, 14, 15

Md. Code Ann., Corr. Servs. § 8-805 ............................................................................ 9, 10

Md. Code Ann., Crim. Proc. § 5-104 ................................................................ 8, 9, 10, 16, 17

**Regulations**

8 C.F.R. § 287.5 ..................................................................................................................... 6

8 C.F.R. § 287.7 ................................................................................................................. 6, 21

8 C.F.R. § 241.2 ..................................................................................................................... 6

**Miscellaneous Authorities**

The Federalist No. 45 (James Madison) (Clinton Rossiter ed., 1961) ............................................ 1

Floor Report, Senate Jud. Proc. Comm., S.B. 791, 2026 Leg., Reg. Sess. ............................... 10, 17

Md. Off. of the Att'y Gen., *Guidance Memorandum: Local Enforcement of Federal Immigration Law: Legal Guidance for Maryland State and Local Law Enforcement Officials* (updated June 2026),
https://oag.maryland.gov/FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance%2006.22.2026%20Update%20%28FINAL%29.pdf ............. passim

Revised Fiscal & Policy Note, S.B. 791, 2026 Leg., Reg. Sess. at 3 (May 4, 2026) ............. 10, 17

**INTRODUCTION**

The Tenth Amendment to the U.S. Constitution preserves states' sovereign authority to direct their own resources to best advance the interest of their residents.  *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"); *see also* The Federalist No. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961) ("The powers reserved to the several States will extend to all the objects, which in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."). Exercising that authority, the Maryland General Assembly enacted the Community Trust Act to establish statewide rules governing the conduct of state and local law enforcement officers and employees of state and local correctional facilities with respect to civil immigration enforcement. The Community Trust Act does not regulate federal officials acting within the State of Maryland, nor does it restrict the exercise of federal immigration authority within Maryland.  It simply defines the circumstances under which Maryland's own personnel, facilities, and other resources may be used in support of civil immigration enforcement, an area of federal responsibility.

Dissatisfied with the General Assembly's policy judgments, the United States brings this action alleging that Maryland's exercise of authority over its own officers and institutions is preempted and unconstitutional because it "prevent[s] state and local law enforcement officials from assisting with federal civil immigration enforcement." Compl. ¶ 6, ECF No. 1.  But declining to devote state resources to federal priorities does not violate the U.S. Constitution.  As the Supreme Court has made clear, "'The Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz v. United*

*States*, 521 U.S. 898, 935 (1997)).  Courts across the country have rejected the federal government's contrary assertions in a host of similar cases.  *See, e.g.*, *United States v. Minnesota*, --- F. Supp. 3d ----, 2026 WL 2085701, at *15–19 (D. Minn. July 20, 2026) (dismissing the United States's preemption challenge to Minnesota laws that limit the use of state resources for federal immigration enforcement purposes); *United States v. Colorado*, --- F. Supp. 3d ----, 2026 WL 878882, at *3–6 (D. Colo. Mar. 31, 2026) (dismissing the United States's preemption challenge to Colorado laws that limit the use of state resources for federal immigration enforcement purposes and seek to protect the rights and personal information of immigrants in Colorado); *United States v. New York*, 814 F. Supp. 3d 266, 276–83 (N.D.N.Y. 2025) (dismissing the United States's preemption challenge to New York law prohibiting its Department of Motor Vehicles from, among other things, disclosing an applicant's records to an agency that primarily enforces immigration law absent a lawful court order or judicial warrant); *United States v. Illinois*, 796 F. Supp. 3d 494, 514–535 (N.D. Ill. 2025) (dismissing the United States's preemption challenge to Illinois laws that prohibit state and local government support of civil immigration activities); *United States v. New Jersey*, No. 20-1364 (FLW) (TJB), 2021 WL 252270, at *5–14 (D.N.J. Jan. 26, 2021) (dismissing United States's preemption challenge to New Jersey Immigrant Trust Directive, which places certain limitations on the authority of local, state, and county law enforcement to assist the federal government with the enforcement of federal civil immigration law).

Here too, the United States's claims fail as a matter of law and should be dismissed.  First, the Community Trust Act is not expressly preempted because no federal statute requires, or could lawfully require, Maryland to furnish the assistance that the Community Trust Act limits and that the United States seeks.  Second, the Community Trust Act is not an unlawful obstacle to federal immigration enforcement, which federal officers remain free to carry out in Maryland using the

authority Congress has conferred upon them.  Finally, because the Community Trust Act governs only the conduct of Maryland's state and local officials and the use of state resources, it neither discriminates against nor directly regulates the federal government.

The Maryland General Assembly made lawful policy choices to regulate its own state and local officers and institutions in the manner it determined would promote public safety, protect individual rights, and foster community trust.  The U.S. Constitution does not permit the federal government to override that judgment merely because it would prefer that Maryland deploy its resources differently.

## BACKGROUND

### I.      Federalism Principles and the Anticommandeering Doctrine

The U.S. Constitution "establishes a system of dual sovereignty between the States and the Federal Government."  *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991); *see also Fed. Maritime Com'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002) ("States, upon ratification of the Constitution, did not consent to become mere appendages of the Federal Government.  Rather, they entered the Union 'with their sovereignty intact.'" (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991))).  States retain all power not expressly delegated to the federal government, including broad authority to regulate matters of public safety and determine how state resources will be deployed.  *See* U.S. Const. amend. X; *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 484 (4th Cir. 2025) ("Under federalism principles engineered into the Constitution, states retain the power to regulate 'matters of health and safety.'" (quoting *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997))).

An inherent feature of our system is that state and federal law may occasionally point in different directions.  *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012) ("From the

3

existence of two sovereigns follows the possibility that laws can be in conflict or at cross-purposes."). Where divergence arises, the Supremacy Clause creates a "rule of decision," *Murphy*, 584 U.S. at 477 (quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015)), providing that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal law preempts state law where Congress has expressly displaced state regulation through the text of a federal statute (express preemption); where Congress has occupied an entire field of regulation leaving no room for state regulation (field preemption); or where state and federal law impose conflicting duties on regulated entities (conflict preemption). *See Murphy*, 584 U.S. at 477–79. Conflict preemption arises either when "it is impossible for a private party to comply with both state and federal requirements" or when "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 275 (4th Cir. 2025) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). In assessing whether federal law preempts state law under the Supremacy Clause, courts begin "'with the basic assumption that Congress did not intend to displace state law.'" *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 336 (4th Cir. 2023) (quoting *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 580 (4th Cir. 2002)).

Importantly, Congress's preemption power is grounded in its authority to regulate private conduct and displace contrary state laws governing that same private conduct. But "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471. Thus, Congress's preemption power is not a license to conscript the states or direct their actions. Under the anticommandeering doctrine, federal statutes that purport to direct the states whether, when, or how to govern cannot give rise to preemption. *See Murphy*, 584 U.S. at 479–80 (holding that a federal law unconstitutionally

prohibited states from authorizing sports gambling); *Printz v. United States*, 521 U.S. at 935 (holding that a federal statute unconstitutionally compelled state officers to conduct background checks on prospective handgun purchasers); *New York v. United States*, 505 U.S. 144, 188 (1992) (holding that a federal law unconstitutionally "direct[ed] the States to provide for the disposal of the radioactive waste generated within their borders").

## II.    Laws Governing Federal Civil Immigration Enforcement

The U.S. Constitution tasks the federal government with regulating immigration.  *See* U.S. Const., art. I; § 8, cl. 4 (Naturalization Clause).  Pursuant to its constitutional authority, Congress has enacted federal civil laws such as the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, governing the entry, admission, status, and removal of noncitizens; and has imposed federal criminal penalties on noncitizens who unlawfully enter or reenter the United States, *e.g.*, 8 U.S.C. § 1325.  Congress has also established federal agencies, including, among others, the U.S. Customs and Border Protection and the U.S. Immigration and Customs Enforcement (ICE), responsible for civil and criminal immigration enforcement functions.  *See* 6 U.S.C. §§ 211, 252.

Through the INA, Congress has invited states and their political subdivisions to voluntarily enter written agreements under which state or local officers may participate in federal immigration enforcement activities.  *See* 8 U.S.C. § 1357(g)(1).  These agreements must relate to the "investigation, apprehension, or detention" of people not lawfully present in the United States and state and local activities under such agreements may be carried out "at the expense of the State or political subdivision and to the extent consistent with State and local law." *Id.* § 1357(g)(1).  The INA makes clear that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement . . . under this subsection." *Id.* § 1357(g)(9).  Section 1357(g)(10) further provides that federal law permits states and localities to

5

cooperate with federal immigration officials in identifying, apprehending, detaining, or removing noncitizens without entering into a formal agreement. *Id.* § 1357(g)(10).

The INA establishes mechanisms through which federal immigration authorities may seek to facilitate the transfer of individuals from state or local custody into federal civil immigration custody: immigration detainers and administrative immigration warrants. An immigration detainer "serves to advise another law enforcement agency that the Department [of Homeland Security] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing" the person. 8 C.F.R. § 287.7(a). The regulation further characterizes a detainer as "a request" that another law enforcement agency "advise the Department [of Homeland Security], prior to the release" of someone alleged to be unlawfully present in the United States, "in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." *Id.* Under federal immigration law, federal immigration officers may also issue administrative warrants. *See* 8 C.F.R. §§ 241.2, 287.5(e). "Administrative warrants differ significantly from warrants in criminal cases because they do not require a detached and neutral magistrate. Instead, executive officers may issue an administrative warrant upon probable cause to believe a civil infraction has occurred." *Lopez-Lopez v. Cnty. of Allegan*, 321 F. Supp. 3d 794, 799 (W.D. Mich. 2018) (citing *Abel v. United States*, 362 U.S. 217, 233 (1960)).

Congress enacted provisions of federal law addressing the exchange of citizenship and immigration status information between federal, state, and local governments. Under 8 U.S.C. § 1373, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding

6

the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Similarly, 8 U.S.C. § 1644 provides that, "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [federal immigration officials] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644. Neither provision requires state or local officials to honor immigration detainers, prolong detentions for purposes of federal civil immigration investigations, participate in federal civil immigration investigations, or otherwise affirmatively assist federal civil immigration enforcement efforts. *Cf. United States v. New York*, 810 F. Supp. 3d 329, 349–50 (N.D.N.Y. 2025) (holding that Sections 1373 and 1644 "reach only information about an individual's citizenship or immigration classification (*e.g.*, lawful permanent resident, visa holder, asylum seeker), and not all personal information about an individual").

### III.    Maryland's Community Trust Act

In April 2026, the Maryland General Assembly enacted Senate Bill 791, the Community Trust Act, and the law took effect in May 2026.

The Community Trust Act establishes statewide standards governing the circumstances under which Maryland's state and local law enforcement officials and correctional employees may participate in federal civil immigration enforcement. The Act builds upon Maryland's existing legal framework by clarifying the limits of state and local involvement in federal immigration matters and establishing uniform requirements for state and local officers and institutions. Among other provisions, the Act addresses when officials may respond to immigration detainers and other requests related to federal immigration enforcement, the circumstances under which certain information may be shared beyond state and local officers and entities, and the use of state or local

7

custodial authority to facilitate federal immigration enforcement.  The Act does not alter the authority of federal immigration officials to enforce immigration laws within Maryland; rather, it defines the role of Maryland's officers and the use of Maryland's resources in assisting with the federal government's immigration-related responsibilities.

Under Section 5-104 of the Criminal Procedure Article of the Maryland Code, Maryland's state and local law enforcement officers are not barred from collaborating with federal immigration authorities on criminal investigations, including those undertaken through a joint task force.  *See* Md. Code Ann., Crim. Proc. § 5-104(b)(3) ("Nothing in this subsection shall prevent a law enforcement agent from inquiring about any information that is material to a criminal investigation."); *see also* Md. Off. of the Att'y Gen., *Guidance Memorandum: Local Enforcement of Federal Immigration Law: Legal Guidance for Maryland State and Local Law Enforcement Officials* 4 & n.18 (updated June 2026) (hereinafter "AG Guidance") , https://oag.maryland.gov/FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance%2006.22.2026%20Update%20%28FINAL%29.pdf.  Thus, state and local law enforcement officers may, for example, arrest a person who is the subject of a judicial arrest warrant for an immigration-related crime and transfer that person to federal immigration authorities pursuing the criminal investigation.  *See AG Guidance* at 4.  Section 5-104 also does not prohibit Maryland law enforcement from responding to inquiries from immigration authorities requesting information related to criminal trafficking or smuggling investigations.  *See id.* at 4.

Section 5-104 provides that state and local law enforcement officers (other than correctional officers) generally may not assist in enforcement of civil federal immigration law.  *See generally* Md. Code Ann., Crim. Proc. § 5-104.  In particular, a Maryland state or local "law enforcement agent may not, during the performance of regular police functions" "inquire about an

8

individual's citizenship, immigration status, or place of birth during a stop, a search, or an arrest";

"detain, or prolong the detention, of an individual" where the purpose of the extension is suspicion

that the individual may have committed a civil immigration violation or for the purpose of

investigating the individual's citizenship or immigration status; "transfer an individual to federal

immigration authorities unless required by federal law"; "coerce, intimidate, or threaten any

individual based on the actual or perceived citizenship or immigration status of the individual" or

their family member, legal guardian, or someone whom they serve as a guardian; or provide federal

immigration authorities with "information about an individual obtained in the course of the law

enforcement agent's duties unless required by a valid court order." *Id.* § 5-104(b)(2); *see also AG*

*Guidance* at 3–5.

Under Maryland law, state and local correctional facilities may not coerce, intimidate, or

threaten a person based on actual or perceived immigration status. Md. Code Ann., Corr. Servs.

§ 8-805(d); *see also AG Guidance* at 8. Where an incarcerated individual is the subject of a certain

type of immigration detainer (one supported by a Form I-205 administrative removal warrant),

Maryland law requires a state correctional facility to notify federal immigration authorities "within

48 hours before the release of the individual." Md. Code Ann., Corr. Servs. § 8-805(c)(2); *see also*

*AG Guidance* at 8. If any incarcerated individual is subject to a different type of immigration

detainer, a State facility may voluntarily provide advance release notification but is not required

to do so. *See AG Guidance* at 8.

For individuals without certain criminal convictions, *see* Md. Code Ann.., Corr. Servs. § 8-

805(a)(4) (defining "convicted individual"), local correctional facilities may not inquire about or

investigate the person's citizenship or immigration status, except where the information is material

to a routine booking procedure; detain or prolong the detention of an individual for the purpose of

investigating citizenship or immigration status or based on suspicion that the individual has committed a civil immigration violation, including at the request of federal immigration authorities unless presented with a valid judicial warrant; notify federal immigration authorities that an individual is in custody, unless required by a valid court order or judicial warrant; or transfer an individual to federal immigration authorities, absent a valid judicial warrant. *Id*. § 8-805(b); *see also AG Guidance* at 7–8. For state and local law enforcement officers, the Community Trust Act amends § 5-104 of the Criminal Procedure Article to generally prohibit these officers from "provid[ing] federal immigration authorities with information about an individual." Md. Code Ann., Crim. Proc. § 5-104(b)(v); *see also AG Guidance* at 3–6. However, "the Maryland General Assembly has thus far chosen to align State law with the principles contained in [8 U.S.C.] § 1373," meaning Maryland law enforcement officers may receive or send only citizenship or immigration status information. *AG Guidance* at 3; *see also* Revised Fiscal & Policy Note, S.B. 791, 2026 Leg., Reg. Sess. at 3 (May 4, 2026); Floor Report, Senate Jud. Proc. Comm., S.B. 791, 2026 Leg., Reg. Sess. at 3 (observing that "federal law does prohibit a state or local government from prohibiting or in any way restricting any government entity or official from sending or receiving from ICE information regarding citizenship or immigration status, lawful or unlawful, of any individual").

The Maryland General Assembly enacted the Community Trust Act to promote consistent statewide practices and strengthen trust between Maryland communities and state and local institutions. By establishing clear rules governing the responsibilities of Maryland officials, the Act seeks to allow state and local law enforcement and correctional employees to focus on their core public safety and government functions while preserving the ability of federal authorities to carry out federal immigration responsibilities. In June 2026, Maryland Attorney General Anthony

G. Brown released updated guidance for state and local law enforcement and correctional officers outlining their responsibilities under state law.  *See generally AG Guidance*.

### IV.      This Lawsuit

On July 9, 2026, the United States filed the present lawsuit against Defendants State of Maryland and Attorney General Anthony G. Brown, in his official capacity.  *See* Compl, ECF No. 1.  The Complaint alleges that the Community Trust Act "reflect[s] an effort to obstruct the operation of federal immigration law and to impede the consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law."  Compl. ¶ 5.  The United States brings Supremacy Clause claims, asserting that the Community Trust Act is expressly preempted by 8 U.S.C. §§ 1373 and 1644 (Count One), Compl. ¶¶ 62–69; that the Community Trust Act stands as an unconstitutional obstacle to federal civil immigration enforcement (Count Two), Compl. ¶¶ 70–79; and that the Community Trust Act unlawfully regulates (Count Three), Compl. ¶¶ 80–84, and discriminates against (Count Four), Compl. ¶¶ 85–88, the federal government in violation of intergovernmental immunity principles.

<strong>LEGAL STANDARD</strong>

Defendants move to dismiss this action for failure to state a claim upon which relief may be granted.  A motion to dismiss under Rule 12(b)(6) "presents a pure question of law, which simply inquires whether the complaint alleges sufficient factual matter, accepted as true, to provide a sufficient basis 'to state a claim to relief that is plausible on its face.'"  *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In assessing a motion under Rule 12(b)(6), a court need not accept legal conclusions set forth in the complaint.  *Iqbal*, 556 U.S. at 678.

11

**ARGUMENT**

The United States's preemption and intergovernmental immunity claims fail as a matter of law. The claims rest on the mistaken premise that because immigration enforcement is a federal responsibility, the State of Maryland must make its own officers and institutions available to facilitate federal enforcement efforts. That premise is inconsistent with the Constitution's allocation of authority between the federal and state governments. Because the Community Trust Act regulates only the conduct of Maryland officials, leaves the federal government free to enforce federal immigration law, and imposes no discriminatory burden on the United States, the claims should be dismissed.

## I.    The Community Trust Act Is Not Preempted by Federal Law.

Federal preemption arises where (1) Congress explicitly states its intent to displace state law within the text of a federal statute (express preemption); (2) Congress creates "a framework of regulation so pervasive . . . that Congress left no room for States to supplement it" (field preemption); or (3) "where compliance with both federal and state regulations is a physical impossibility" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399–400 (internal quotation marks and citations omitted). The United States asserts that 8 U.S.C. §§ 1373 and 1644 expressly preempt the Community Trust Act (Count One); and that the Community Trust Act poses an unconstitutional obstacle to federal objectives (Count Two). Each contention is meritless and the United States's claims must be dismissed.

### A.  No Federal Law Expressly Preempts the Community Trust Act.

The United States's express preemption claim (Count One) rests on two federal statutes, 8 U.S.C. §§ 1373 and 1644. Neither provision expressly preempts the Community Trust Act because these statues are not valid preemption provisions. To expressly preempt state law, federal law must

12

"regulate[] the conduct of private actors, not the States," *Murphy*, 584 U.S. at 479, yet these provisions purport to directly regulate the States, not private actors.  In any event, if those provisions are enforceable as preemption provisions, the Community Trust Act does not conflict with them.  Properly construed, Sections 1373 and 1644 concern only information regarding an individual's citizenship or immigration status, information that the Community Trust Act permits state and local law enforcement to share.  The federal provisions do not prohibit states from regulating other categories of information, defining the duties of state officials, or limiting the circumstances under which state officials may participate in federal immigration enforcement.

1.      *Sections 1373 and 1644 Are Not Valid Preemption Provisions.*

The Supreme Court's decision in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018), forecloses the United States's claim that 8 U.S.C. §§ 1373 and 1644 can give rise to preemption under the Supremacy Clause.

In *Murphy*, the Supreme Court explained that the Constitution "confers upon Congress the power to regulate individuals, not States."  584 U.S. at 472 (quoting *New York*, 505 U.S. at 166).  Accordingly, "[e]very form of preemption is based on a federal law that regulates the conduct of private actors, not the States."  *Id.* at 479.  That is because the Supremacy Clause "is not an independent grant of legislative power to Congress" but rather provides "a 'rule of decision'" when federal law regulating private conduct conflicts with state law that does the same.  *Id.* at 477 (quoting *Armstrong*, 575 U.S. at 324).  Thus, as *Murphy* explained, a federal statute that "dictates what a state legislature may and may not do," *id.* at 474, is not a valid preemption provision.  *Id.* at 479–80.  *Murphy* made clear that courts must determine as a threshold matter whether the federal provision "represent[s] the exercise of power conferred on Congress by the Constitution," and whether it is "best read as one that regulates private actors," not States.  *Id.*  If either requirement is absent, the statute does not operate as a valid preemption provision.  *See id.*  This is true even

13

where the federal interests are strong; "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate." *New York*, 505 U.S. at 178.

Sections 1373 and 1644 are precisely the type of statutes that *Murphy* held are not valid preemption provisions. Section 1373(a) bars "Federal, State, or local government entit[ies] or official[s]" from "prohibit[ing], or in any way restrict[ing], any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1644 features similar language: "no State or local government entity may be prohibited or in any way restricted," from communicating certain information to the federal government. 8 U.S.C. § 1644.

These provisions do not regulate private actors. Nor do they establish substantive rules governing federal immigration enforcement. Instead, they purport to prohibit states and local governments from adopting policies governing the conduct of their own officers and the operations of their own institutions. As other courts have held, Sections 1373 and 1644 are not valid preemption provisions under the test set out in *Murphy*. *See, e.g.*, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of the State of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021) ("Our conclusion that neither § 1373 nor § 1644 regulates private actors is fatal to Appellants' argument that they preempt the Directive. A federal statute that does not regulate private actors cannot serve as a basis for preemption." (internal citation omitted)); *Illinois*, 796 F. Supp. 3d at 521 ("Section 1373(a) is not a preemptive provision because it doesn't regulate private actors in language or effect. The plain test of § 1373 only operates on State and local government entities and officials, prohibiting restrictions on their ability to share certain immigration-related information with DHS.").

14

The federal government's position would turn the Supremacy Clause on its head. The federal government contends that Sections 1373 and 1644 prohibit Maryland from enacting laws that define the circumstances under which its officers may share information received during the performance of their state law roles. But the anticommandeering doctrine does not permit Congress to accomplish indirectly through the Supremacy Clause what it could not require directly. *See Murphy*, 584 U.S. at 469–79; *Printz*, 521 U.S. at 935. Congress cannot require states to assist in the administration of federal programs. Yet that is precisely what the United States seeks.

    2.    *In Any Event, the Community Trust Act Does Not Conflict with Sections 1373 and 1644.*

Even if Sections 1373 and 1644 were constitutionally valid preemption provisions, which they are not, the Community Trust Act remains consistent with these federal provisions such that the Act is not expressly preempted. The United States's contrary argument depends on reading the federal and state provisions far more broadly than their text permits.

Congress chose narrow language for Sections 1373 and 1644. Those provisions protect the voluntary exchange of "information regarding the citizenship or immigration status" of an individual. 8 U.S.C. §§ 1373(a), 1644. As many courts have held, the provisions cover only "a person's legal classification under federal law" and do not reach any other information about an individual, such as their contact information, address, release date, or custody status. *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019); *see also Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020), *aff'd sub nom. Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of the State of N.J.*, 8 F.4th 176 (3d Cir. 2021); *New York*, 814 F. Supp. 3d at 277–78. Nor do these statutes restrict state and local governments from prohibiting their officers from inquiring of individuals about status information in the first place. *See, e.g., California*, 921 F.3d at 876, 891–93

15

(upholding a state statute prohibiting such inquiries); *New York*, 814 F. Supp. 3d at 277 (same). Had Congress intended to cover state regulation of those subjects, it knew how to do so.

Properly construed, the Community Trust Act is consistent with any limited demand imposed by Sections 1373 and 1644 as it permits disclosure of citizenship and immigration status information. The text of the state statute must be interpreted in the context of the broader statutory scheme. *See Lockshin v. Semsker*, 412 Md. 257, 276 (2010) ("[T]he plain [statutory] language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute."). Before the General Assembly enacted the Community Trust Act prohibiting state and local law enforcement officers from sharing certain "information about an individual," state law already generally prohibited those officers from inquiring into a person's "citizenship, immigration status, or place of birth" during a stop. Md. Code Ann., Crim. Proc. § 5-104(b)(2)(i). Because the General Assembly legislated against that backdrop, the most natural reading is that the information-sharing restriction addresses the types of information officers are authorized and likely to obtain in the ordinary course of their duties—not immigration or citizenship status information that state law generally forbids them from soliciting in the first place. Reading the statute otherwise would attribute to the General Assembly an intent to regulate information that it had already sought to keep state and local officers from collecting at all.

That understanding is reinforced by the General Assembly's choice of language. When it has intended to regulate the collection or use of immigration-status information, the General Assembly has done so expressly, referring specifically to "citizenship, immigration status, or place of birth." *See* Md. Code Ann., Crim. Proc. § 5-104(b)(2)(i). In the challenged provision of the Community Trust Act, the General Assembly used the general phrase "information about an

16

individual." Md. Code Ann., Crim. Proc. § 5-104(b)(v). The Court should presume that wording was deliberate. *Cf. Lawrence v. State*, 475 Md. 384, 406 (2021) ("It is a common rule of statutory construction that, when a legislature uses different words, especially in the same section or in a part of the statute that deals with the same subject, it usually intends different things." (quoting *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223 (2003))). Had the General Assembly intended to prohibit state and local law enforcement officers from sharing immigration or citizenship status information, it knew how to say so directly.

This reading also accords with settled principles of statutory construction, which counsel harmonizing state and federal laws where possible. The General Assembly enacted the Community Trust Act with awareness of federal provisions including Section 1373. The General Assembly's fiscal note and Senate floor report for the Community Trust Act both acknowledged Section 1373 without providing any suggestion that the bill would disregard it. *See* Revised Fiscal & Policy Note, S.B. 791, 2026 Leg., Reg. Sess. at 3 (May 4, 2026); Floor Report, Senate Jud. Proc. Comm., S.B. 791, 2026 Leg., Reg. Sess. at 3. The General Assembly also knew that, in the past, its laws restricting the use of state and local resources for immigration enforcement have always been interpreted to allow the sharing of citizenship or immigration status information. *See AG Guidance* at 6 n.23 (discussing the established interpretations of Md. Code Ann., Gen. Prov. § 4-320.1 and Crim. Proc. § 5-104). The Court should not presume that the General Assembly intended to enact a statute in conflict with federal law absent a clear statement to that effect. Rather, where a state statute is susceptible to more than one reasonable interpretation, courts generally adopt the construction that avoids constitutional concerns. *See Am. Petroleum Inst. v. Cooper*, 718 F.3d 347, 354 (4th Cir. 2013) ("[W]hen determining the interplay of the federal and state statutes at issue,

17

we are obliged to attempt to harmonize those statutes if reasonably possible."); *Chappell v. S. Md. Hosp.*, 320 Md. 483, 494 (1990) (similar).

The Maryland Attorney General has likewise interpreted the Community Trust Act consistently with federal law, advising state and local law enforcement that the Act does not prohibit the sharing only information regarding an individual's citizenship or immigration status. *AG Guidance* at 3. The Guidance explains that the Act governs other categories of information and state law enforcement activities outside the scope of those federal provisions. *See id.* at 3–9. The Guidance is consistent with the text, purpose, and history of the Act and confirms the best reading of the state statutory text.

The federal government's interpretation of federal and state law would mean that Sections 1373 and 1644 operate as federal directives controlling how Maryland structures the duties of its own law enforcement officers. This is precisely the type of command that *Murphy* and a host of other cases forbid. *See Cnty. of Ocean*, 475 F. Supp. 3d at 376–77 ("If the Court were to accept the broad reading of sections 1373(a) and 1644 advanced by Plaintiffs and the United States, and find preemption, these particular provisions would run afoul of the anticommandeering doctrine.").

**B. The Community Trust Act is Not an Unconstitutional Obstacle to Federal Immigration Enforcement.**

The United States's obstacle preemption theory (Count Two) likewise fails as a matter of law. Under the United States's view, the Community Trust Act unconstitutionally "impedes the Federal Government's ability to regulate immigration and take enforcement actions against illegal aliens by preventing state and local law enforcement officials from assisting with federal civil immigration enforcement." Compl. ¶ 6; *see also* Compl. ¶¶ 70–79. The Act poses no unconstitutional obstacle.

"Obstacle preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes of the federal law." *N. Va. Hemp & Agric., LLC*, 125 F.4th at 493. Courts in this Circuit assess a conflict preemption claim by "first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *Id.* (quoting *H&R Block E. Enters. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (alteration in original)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 684 (D. Md. 2025) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). The Supreme Court has emphasized that "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry' into whether a state statute is in tension with federal objectives. . . . Our precedents establish a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quotation marks and citations omitted)). Similarly, the Fourth Circuit has instructed that "a court should not find conflict preemption unless preemption was 'the clear and manifest purpose of Congress.'" *N. Va. Hemp & Agric., LLC*, 125 F.4th at 493 (quoting *Arizona*, 567 U.S. at 400). The federal government has fallen well short of this high threshold.

The purpose and intended effect of the Immigration and Nationality Act and other federal immigration laws is to vest federal immigration officials with broad authority to administer and enforce the Nation's immigration laws, including the authority to inspect, interrogate, investigate, arrest, detain, and remove noncitizens suspected of violating federal law. *E.g.*, 8 U.S.C. §§ 1182, 1226, 1231, 1357. The Community Trust Act leaves every aspect of that federal authority untouched. It does not limit federal officers from investigating suspected immigration violations,

questioning individuals, making arrests authorized by federal law, taking individuals into federal custody, initiating or conducting removal proceedings, or otherwise carrying out any responsibility Congress assigned to federal immigration authorities.  And the United States identifies no provision of the Community Trust Act that prohibits any federal official from carrying out any responsibility assigned by Congress.

At most, the Complaint alleges that the federal government would prefer that Maryland provide assistance to ease efforts by federal immigration officials to discharge the federal officials' congressionally assigned responsibilities.  *See* Compl. ¶ 5 (alleging that "consultation and communication between federal, state, and local law enforcement officials [] is necessary for federal officials to carry out federal immigration law").  But a state's decision not to devote its own officers or resources to federal enforcement is fundamentally different from obstructing federal officers from executing their responsibilities.  *See California*, 921 F.3d at 890 ("[T]he choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal.").

The INA and other federal immigration laws do not have the purpose or effect of compelling state participation in federal immigration enforcement.  The United States's theory that a state's decision to refrain from participating in federal civil immigration enforcement amounts to an obstacle to federal enforcement disregards the essential constitutional backdrop against which Congress enacted federal immigration laws.  The Tenth Amendment prohibits Congress from compelling states to administer or enforce federal regulatory programs.  *Murphy*, 584 U.S. at 473 ("'The Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" (quoting *Printz*, 521 U.S. at 935)).  Congress legislated against that constitutional backdrop, and the INA and other federal

immigration laws reflect that Congress created certain opportunities for states to voluntarily participate in federal immigration enforcement but did not—and could not—mandate such participation. *See, e.g.*, 8 U.S.C. § 1357(g)(9) (providing that nothing in the subsection shall be construed to require any state or political subdivision of a state to enter into an agreement with the Attorney General to participate in federal immigration enforcement); 8 C.F.R. § 287.7 (an immigration detainer "is a *request* that [an] agency advise the Department [of Homeland Security], prior to release of the alien"); *see also Arizona*, 567 U.S. at 408 ("Federal law specifies limited circumstances in which state officers *may* perform the functions of an immigration officer."); *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement"); *cf. Minnesota*, 2026 WL 2085701 at *16 (holding that, to the extent the United States's preemption claims against Minnesota were based on 8 C.F.R. § 287.7 and 8 U.S.C. § 1357(g), they "fail because these provisions are voluntary and cannot carry preemptive force."). Through its enactments, Congress intended to encourage States to aid federal law enforcement efforts, but, as other courts have observed, "a hope, however fervent, that federal-state cooperation will occur does not empower the federal government to conscript the States; were it otherwise, the anticommandeering doctrine would cease to exist." *New York*, 810 F. Supp. 3d at 351; *see also Minnesota*, 2026 WL 2085701 at *16.

Further, in its enactment of federal immigration laws, Congress has not exhibited a clear and manifest intent to displace the states' traditional police powers. Regulation of state and local law enforcement officers, the operation of state correctional facilities, and the handling of information obtained through state law enforcement activities all lie at the core of the states' historic police powers. *See Buchanan v. Warley*, 245 U.S. 60, 74 (1917) ("The authority of the

state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safety and welfare is very broad."); *Ensminger v. Comm'r of Internal Revenue*, 610 F.2d 189, 191 n.4 (4th Cir. 1979) ("Federal deference in matters within the state police power reflects more than a policy of comity.  In fact, it represents a constitutionally derived recognition of the essential character of state government within our federal system.").  As the Fourth Circuit has explained, where Congress intends "such a radical change in the federal-state balance," it would speak "with a much clearer voice" in setting out an intent to preempt potentially inconsistent state laws.  *GenBioPro, Inc.*, 144 F.4th at 277.  This Court should not lightly conclude that Congress intended to displace the states' traditional police powers.

Maryland retains the historic police power to define the scope of its officers' authority, ensuring that individuals are not held in state custody beyond the period authorized by state law, establishing clear rules governing when state officials may transfer individuals from state custody, and regulating the disclosure of information and correctional activities.  Maryland also has a strong interest in promoting community trust.  By adopting uniform rules governing these quintessential state functions, the Act promotes lawful administration of Maryland's criminal justice and correctional systems, provides clear guidance to state and local officers, and reduces the risk that state officials will exceed the authority conferred by state law.  States also have an interest in avoiding entangling their officers in the complexities of federal immigration enforcement.  *See Arizona*, 567 U.S. at 409 (acknowledging the "significant complexities involved in enforcing federal immigration law").  Nothing in the INA suggests that Congress intended to restrict states from setting out such state rules because they may result in less willingness to voluntarily assist in federal immigration enforcement.  The United States's conflict preemption claim fails as a matter of law, and it should be dismissed.

II.    **The Community Trust Act Does Not Violate Principles of Intergovernmental Immunity.**

The United States also alleges that the Community Trust Act violates the intergovernmental immunity doctrine because the Act purportedly regulates the federal government (Court Three) and discriminates against it (Count Four).  Neither theory states a claim upon which relief may be granted.

The Supremacy Clause "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it," *United States v. Washington*, 596 U.S. 832, 835 (2022), under the intergovernmental immunity doctrine.  "A state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." *Id.* at 839 (brackets, internal quotation marks, and citations omitted).  "[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government *and* burden it in some way." *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116 (9th Cir. 2025) (alteration in original) (emphasis added) (quoting *California*, 921 F.3d at 880).  In considering claims of governmental immunity, courts adopt "a functional approach" that "accomodat[es] the full range of each sovereign's legislative authority." *North Dakota v. United States*, 495 U.S. 423, 435 (1990).  A state law "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983).

The United States's claims fail because the Community Trust Act does not regulate or discriminate against the federal government.  Rather, it defines the scope of authority Maryland confers on its own officers and sets out the circumstances under which Maryland's state and local officials may exercise state law enforcement and correctional powers.

23

**A.  The Community Trust Act Does Not Directly Regulate the Federal Government.**

A state law directly regulates the United States "when it 'places [either] a prohibition' or a mandate on the federal government." *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (alteration in original) (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)).  Although the Supremacy Clause "does not 'bar[] all state regulation which may touch the activities of the Federal Government,'" it "does draw a line at those that 'place[] a prohibition on the Federal Government." *Id.* at 324.  The Supreme Court has "thoroughly repudiated" the view that "any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota*, 495 U.S. at 434–35; *cf. Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270–71 (1943) (holding that state regulation of federal contractor's milk prices did not violate intergovernmental immunity even though it increased the federal government's procurement costs).  The critical question is whether state laws "affect incidentally the mode of carrying out [federal] employment," or rather seek to "control" federal functions.  *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).

The Community Trust Act regulates only the conduct of Maryland state and local officials.  It does not require federal immigration officials to seek or obtain Maryland's permission before investigating immigration violations, questioning individuals, making arrests authorized by federal law, executing federal warrants, taking individuals into federal custody, initiating removal proceedings, or otherwise enforcing federal immigration law.  The Act leaves every federal immigration power Congress conferred upon federal immigration officials exactly as it found it.

The United States instead alleges that the Act regulates federal operations because, in certain circumstances, federal immigration authorities must obtain a judicial warrant or court order to secure the involvement of Maryland's officers in immigration activities such as honoring federal immigration requests.  Compl. ¶¶ 82–83, ECF 1.  But the United States conflates a limitation on

24

the authority of Maryland officials with a regulation of federal officials. The Community Trust Act does not at all require the United States to obtain a judicial warrant or court order as a condition of exercising any federal power. Rather, the Act provides that Maryland's officers may not exercise Maryland's detention authority or other powers conferred by Maryland law absent specified conditions. The practical effect is not that the federal government faces "a requirement in excess of federal law," as the United States alleges, Compl. ¶ 83, but instead that the federal government may either rely on its own officers or seek the participation of Maryland officers who are bound by state law restrictions.

Maryland's regulation of its own officers may "affect incidentally the mode of carrying out [federal] employment," *Johnson*, 254 U.S. at 56, but such a state law does not unconstitutionally regulate the federal government. The Community Trust Act is simply an internal governance measure. States routinely establish rules governing how their own officers exercise sovereign authority, including when officers may make arrests, continue detentions, transfer individuals who are in state custody, disclose law enforcement information, participate in joint operations, or assist other jurisdictions. Those internal policies may affect the extent to which federal, state, tribal, or other jurisdictions receive assistance from the State's officials, but they can hardly be seen as regulating those other sovereigns. Consistent with this point, courts have repeatedly held that regulation of a state's own officials, even where such regulation indirectly affects federal operations, does not violate the intergovernmental immunity doctrine. *See, e.g.*, *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206–07 (5th Cir. 2024) ("Texas's suit does not seek to control how Border Patrol agents carry out their duties. At most, Texas's seeking to preserve its *own* property might incidentally affect how agents do their jobs."); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 592–93 (7th Cir. 2022) (Illinois law that barred state and local law enforcement from entering

25

into or maintaining cooperative agreements for immigration detention "directly regulates only State and local entities and law enforcement—not the federal government" and thus does not unconstitutionally regulate the federal government); *New York*, 810 F. Supp. 3d at 352–53 (New York law barring certain civil immigration arrests at state courthouses did not regulate federal agents and instead defined "what activities are not permissible in state-owned facilities"); *Illinois*, 796 F. Supp. 3d at 535 ("[T]he Policies prohibit employees from responding to immigration detainers, providing release data information, or giving immigration agents access to persons in custody unless presented with a criminal warrant. . . . All dictate what local workers may and may not do.  None of the Polices impose 'direct regulation on any federal official or agency.'" (quoting *McHenry Cnty.*, 44 F.4th at 593)).

Accepting the United States's theory would substantially expand the intergovernmental immunity doctrine beyond constitutional limits and in ways repeatedly rejected by the Supreme Court.  *See North Dakota*, 495 U.S. at 434 ("Over 50 years ago, however, the Court decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional").  Under its view, any state law governing the duties of state employees or the allocation of state resources could be recast as a prohibited regulation whenever the federal government asserts that it would prefer greater state assistance.  The doctrine does not extend so far.  Because the Community Trust Act regulates only Maryland officials and the use of Maryland resources, not the federal government or its operations, the Complaint fails to state a claim for direct regulation under the intergovernmental immunity doctrine.

**B. The Community Trust Act Does Not Unconstitutionally Discriminate Against the Federal Government.**

The Complaint likewise fails to state a claim of discrimination under the intergovernmental immunity doctrine, and, accordingly, Count Four should be dismissed.

"A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees." *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 763 (9th Cir. 2025) (citing *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019)); *see also Washington*, 596 U.S. at 839 ("A state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." (brackets, internal quotations marks, and citations omitted)).  Central to a claim of discrimination against the federal government is a comparator establishing that the state law imposes costs or burdens on the federal government that are not imposed on similarly situated others.  *See McHenry Cnty.*, 44 F.4th at 594 ("Differential treatment is critical to a discrimination-based intergovernmental immunity claim."); *see also, e.g.*, *Washington*, 596 U.S. at 839 (Washington law violated the intergovernmental immunity principle where it "explicitly treat[ed] federal workers differently than state or private workers.  And, in doing so, the law impose[d] upon the Federal Government costs that state or private entities do not bear" (citation omitted)); *Dawson*, 586 U.S. at 180 (West Virginia law exempting pension benefits of certain former state and local law enforcement employees from state taxation impermissibly favored state employees).  "Whether a State treats similarly situated state and federal employees differently depends on how the State has defined the favored class." *Dawson*, 586 U.S. at 177.  A claim of unlawful discrimination requires a comparator; "[t]he mere fact that [a state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594; *cf. California*, 921 F.3d at 881 (explaining that intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment").

A claim of unlawful discrimination also requires a showing that the challenged law

27

burdens the federal government.  "The nondiscrimination rule finds its reason in the principle that the States may not directly obstruct the activities of the Federal Government." *North Dakota*, 495 U.S. at 437–38; *see also McCulloch v. Maryland*, 17 U.S. 316, 322 (1819) ("The states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into effect the powers vested in the national government.").  For that reason, courts have invalidated discriminatory state laws only where those laws burden the federal government.  *See, e.g.*, *California*, 921 F.3d at 880 ("[I]ntergovernmental immunity attaches only to state laws that discriminate against the federal government *and* burden it in some way." (emphasis added)).

The Community Trust Act does not require federal officials to satisfy legal obligations that do not apply to similarly situated others.  It does not impose unique licensing, permitting, taxation, or other regulatory requirements on federal operations.  And it does not deny the federal government access to generally available governmental services offered within the State of Maryland.  Rather, the Community Trust Act establishes the circumstances under which Maryland officers may exercise Maryland custodial, correctional, and law enforcement authority in connection with immigration-related requests.  The only legal duties created by the Act are duties imposed upon Maryland officials.

Likewise, the Community Trust Act does not treat federal immigration authorities less favorably because they are federal.  Rather, the Act defines the circumstances under which Maryland officials may participate in a particular category of activity—immigration-related enforcement—and establishes limits on the authority Maryland has chosen to confer on its own officers.  The Act refers to federal immigration authorities because requests involving immigration enforcement generally originate from the federal government.  But the State of Maryland has not

imposed any special burden on the United States as compared to similarly situated others.

The absence of a comparator confirms that the Community Trust Act is not discriminatory. As the Supreme Court explained in *Dawson v. Steager*, "[w]hether a State treats similarly situated state and federal employees differently depends on how the State has defined the favored class." 586 U.S. at 177.  Here, the relevant class is Maryland officials whose duties involve exercising authority conferred by Maryland law.  The United States has not identified any similarly situated state, local, or private actor that may request the same assistance, exercise the same authority, or engage in the same federal immigration enforcement functions while receiving more favorable treatment.  *See Illinois*, 796 F. Supp. 3d at 534 ("It is doubtful that a comparator exists, for the United States concedes that only the federal government enforces civil immigration law.").  There is therefore no basis to conclude that Maryland has placed the federal government in a less favorable position because of its federal status.

The United States cannot establish discrimination merely by observing that the Community Trust Act limits Maryland officials' role in immigration-related activities.  *See McHenry Cnty.*, 44 F.4th at 594.  Intergovernmental immunity does not prohibit every state law that affects the federal government or relates to a uniquely federal function.  *See id.*  Rather, the question is whether the State has singled out the federal government for less favorable treatment *and* imposed an unfavorable burden because of the federal government's status as a sovereign.  *See Washington*, 596 U.S. at 839.  The United States has not and cannot make that showing.

The United States's theory would extend the doctrine of intergovernmental immunity far beyond its constitutional purpose.  Intergovernmental immunity protects each sovereign from impermissible regulation by the other.  *See Davis v. Mich. Dept. of Treas.*, 489 U.S. 803, 814 (1989) ("[I]ntergovernmental tax immunity is based on the need to protect each sovereign's governmental

operations from undue interference by the other."). The doctrine does not require a state to participate in the federal government's programs or make its own sovereign authority available to advance federal objectives. The anti-commandeering principle fortifies this constitutional boundary. The federal government may not compel states to administer federal programs or require state officials to carry out federal functions. *Murphy*, 584 U.S. at 469–79; *Printz*, 521 U.S. at 935. A state therefore does not discriminate against the federal government by defining the circumstances under which its own officials may participate in federal enforcement activities. *See, e.g.*, *California*, 921 F.3d at 891 (rejecting, as inconsistent with the Tenth Amendment, an intergovernmental immunity challenge to a California law that limited the participation of state and local officers in immigration enforcement); *Minnesota*, 2026 WL 2085701, at *22 ("[A] finding that any of the challenged provisions violates intergovernmental immunity would imply that a Defendant must assist with the federal government's immigration enforcement efforts."). If accepted, the United States's argument would transform the intergovernmental immunity principle from protection against discriminatory state burdens into a constitutional entitlement to state assistance on the federal government's terms. *See id.* Such a rule is inconsistent with the Constitution's allocation of authority between the federal and state governments. Count Four of the United States's Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, the United States's claims should be dismissed.

30

Dated:  July 31, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar No. 31472)
Adam Kirschner (D. Md. Bar No. 31767)
Lauren Gorodetsky (D. Md. Bar No. 32172)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD  21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Counsel for Defendants*

31