**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| v. | * | |
| THE STATE OF MARYLAND, and ANTHONY G. BROWN, Attorney General of the State of Maryland, in his official capacity, | * | Case No. 1:26-cv-02719-MJM |
| | * | |
| Defendants. | * | |
| | * | |

*  *  *  *  *  *  *  *  *  *  *  *

**REPLY MEMORANDUM IN SUPPORT**
**<u>OF DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1
ARGUMENT ......................................................................................................... 1
I. The Tenth Amendment Protects States' Right to Choose Their Role in Implementing Federal Programs......................................................................................................... 1
II. The Complaint Fails to State a Preemption Claim. ............................................ 4
A. Sections 1373 and 1644 Do Not Expressly Preempt the Community Trust Act. ........... 4
B. The Community Trust Act is Not Obstacle Preempted. ....................................... 8
III. The Complaint Fails to State an Intergovernmental Immunity Claim. ........................ 10
A. The Community Trust Act Does Not Regulate Federal Immigration Authorities........ 10
B. The Community Trust Act Does Not Unconstitutionally Discriminate Against the United States.......................................................................................................... 12
CONCLUSION ..................................................................................................... 15

## TABLE OF AUTHORITIES

### Cases

*Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018) .................... 8

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .................... 8

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) .................... 14

*Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020) .................... 2, 3, 4

*City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328 (1994) .................... 7

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) .................... 9

*City of Philadelphia v. Attorney Gen. of the U.S.*, 916 F.3d 276 (3d Cir. 2019) .................... 3

*CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025) .................... 11

*Crowell v. Benson*, 282 U.S. 22 (1932) .................... 8

*Genesis GSA Strategic One, LLC v. Howard County*,
No. 26-cv-915, 2026 WL 2294479 (D. Md. Aug. 10, 2026) .................... 14, 15

*GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2024) .................... 11

*Johnson v. United States*, 254 U.S. 51 (1920) .................... 10, 11

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) .................... 11

*Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018) .................... 4, 5, 6, 7, 8

*N. Va. Hemp & Agric., LLC*, 125 F.4th 472 (4th Cir. 2025) .................... 8, 9

*North Dakota v. United States*, 495 U.S. 423 (1990) (plurality opinion) .................... 13

*New York v. United States*, 505 U.S. 144 (1992) .................... 2, 6

*Printz v. United States*, 521 U.S. 898 (1997) .................... 2, 4, 6, 7, 15

*Reno v. Condon*, 528 U.S. 141, 150 (2000) .................... 6

*Rosmer v. Pfizer Inc.*, 263 F.3d 110 (4th Cir. 2001) .................... 7

*United States v. New Mexico*, 455 U.S. 720 (1982) .................... 13

**Statutes**

8 U.S.C. § 1373 ........................................................................................................ 4, 5

8 U.S.C. § 1644 ........................................................................................................ 4, 5

Md. Code. Ann., Crim. Proc. § 5-104 ........................................................................ 12, 13

**Miscellaneous Authorities**

Md. Off. of the Att'y Gen., *Guidance Memorandum: Local Enforcement of Federal Immigration Law: Legal Guidance for Maryland State and Local Law Enforcement Officials* (updated June 2026), https://oag.maryland.gov/FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance%2006.22.2026%20Update%20%28FINAL%29.pdf ........ 12, 13, 14

## INTRODUCTION

Maryland's Community Trust Act applies exclusively to state and local governmental actors. It governs when and how Maryland's state and local law enforcement officers and correctional employees must, may, or may not assist in federal immigration enforcement. As the United States's Opposition confirms, it asks this Court to invalidate the Act on the mistaken premise that Congress's authority over immigration permits it to dictate the terms on which Maryland's officials must aid the federal government. But the Tenth Amendment does not permit the federal government to compel such assistance. *See* Mem. in Supp. of Mot. to Dismiss at 3–5, 15, 18, 21, 30 (describing and applying the Tenth Amendment anticommandeering principle), ECF No. 5-1 ("Mot."). For the reasons set forth below and in Defendants' Motion to Dismiss, the Community Trust Act is not preempted by federal law and does not violate principles of intergovernmental immunity. The United States's claims should therefore be dismissed.

## ARGUMENT

The United States's arguments against dismissal begin with a series of fundamentally mistaken propositions about the Tenth Amendment and federal authority over states. Correcting those errors reveals the fatal flaw in the United States's claims: it cannot prevail without requiring Maryland to administer and enforce a federal program, in direct conflict with the Constitution's anticommandeering principle. The Supremacy Clause claims should be dismissed.

### I. The Tenth Amendment Protects States' Right to Choose Their Role in Implementing Federal Programs.

To start, the United States contends that Congress has "codified basic principles of cooperation and comity between state and local authorities and the Federal Government" regarding immigration enforcement. Pl.'s Opp'n to Defs.' Mot. to Dismiss at 4, ECF No. 6 ("Opp'n"). Yet, as the Supreme Court has repeatedly avowed, "[t]he Federal Government may neither issue

directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also, e.g.*, *New York v. United States*, 505 U.S. 144, 149 (1992) (Congress's "substantial power under the Constitution to encourage the States" to take part in federal programs "does not confer upon Congress the ability to simply compel the States to do so."). Thus, the notion of congressionally codified rules of cooperation to which states are bound is inconsistent with the Tenth Amendment and must be rejected.

The United States attempts to avoid the constitutional problem by characterizing the assistance at issue as "modest measures of cooperation." Opp'n at 27. It emphasizes that federal law does not require Maryland officers to "arrest aliens or enforce federal immigration law," but nevertheless, in the United States's view, requires states to take certain actions in connection with federal immigration enforcement, including honoring immigration detainers. *Id.* at 27–28. That distinction does not save the United States's theory, which remains constitutionally untenable. *Printz* is directly on point and rejected the notion that "requiring state officers to perform discrete, ministerial tasks" falls outside the anticommandeering principle. 521 U.S. at 929–30; *see also id.* at 933 (striking down a federal statute that attempted to force state law enforcement to conduct background checks as part of a federal firearm regulatory program). The Supreme Court explained that even ministerial requirements impermissibly place state officials in the position of implementing and bearing responsibility for federal policy. *See id.* at 930–31.

The Fourth Circuit similarly rejected this proposition in *Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020), holding that a federal statute could not, consistent with the anticommandeering doctrine, be interpreted to require state law enforcement agencies to issue identification as part of a federal concealed carry scheme. *Id.* at 481–82. The Circuit called this "the exact sort of

dragooning that the anticommandeering doctrine forbids." *Id.* at 481. Thus, the relevant question is not whether the federal government demands only assistance it believes to be "modest," but whether it commands state officers to perform functions in service of a federal program.

The United States's related suggestion that federal immigration authority encompasses the conduct of Maryland's officers is also mistaken. *See* Opp'n at 3–7. The federal government may regulate immigration and prescribe the conduct of federal officials enforcing immigration law, but that authority does not extend to prescribing or modifying the duties Maryland assigns to its own officers. As Defendants' Motion explains, regulating Maryland's police forces is an exercise of the State's historic police powers. Mot. at 21–22. The federal government cannot recharacterize this state function as a federal one merely because it concerns whether and how Maryland's officers may interact with federal immigration authorities. *Cf. City of Philadelphia v. Attorney Gen. of the U.S.*, 916 F.3d 276, 281 (3d Cir. 2019) (explaining that the federal government's "broad, undoubted power over the subject of immigration and the status of aliens" and states' "primary authority for defining and enforcing criminal" "intersect when a state or city arrests an individual whom ICE would also like to apprehend for removal proceedings" (citations omitted)).

Similar principles foreclose the United States's suggestion that, because Maryland officers may take individuals into state custody, Maryland must also perform additional functions in furtherance of federal immigration enforcement. *See* Opp'n at 28. Maryland's exercise of its own custodial authority does not authorize the federal government to prescribe what Maryland officers must do next. Indeed, the United States concedes that no federal law requires states to transfer unlawfully present individuals to federal custody after they have served their state sentences, arguing instead that "the United States *could have* prescribed" such procedures. Opp'n at 29 (emphasis added). The United States thus asks the Court to derive state obligations from the mere

fact that federal immigration enforcement may follow state custody, rather than from any federal statute imposing that obligation. That inference is especially problematic where, as the Fourth Circuit said in *Carey*, the anticommandeering inquiry turns on "the nature of the federal ask, not the existence vel non of state acquiescence." 957 F.3d at 481 (citing *Printz*, 521 U.S. at 929–30).

The United States's assertion that federal immigration enforcement would be less effective without Maryland's cooperation does not change the constitutional analysis. *See* Opp'n at 5. As a sovereign state, Maryland is entitled to draw its own conclusions about how to most effectively use its own law enforcement resources. Also, the Supreme Court has rejected the notion that the federal government may compel state participation simply because doing so may be the preferred means of advancing federal policy. *See Printz*, 521 U.S. at 931–32 (balancing factors such as efficiency is "inappropriate" where "it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty").

In short, the United States cannot transform Congress's encouragement of cooperation or federal authority over immigration into authority to direct Maryland's officers. Once the Tenth Amendment is properly understood as a constraint on federal power over the states, the United States's preemption and intergovernmental immunity arguments necessarily fail.

## II. The Complaint Fails to State a Preemption Claim.

As set out in Defendants' Motion, the United States's preemption claims fail. Nothing in the United States's Opposition changes that conclusion.

### A. Sections 1373 and 1644 Do Not Expressly Preempt the Community Trust Act.

The United States's arguments against dismissing its express preemption claim cannot be squared with *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453 (2018). Under a straightforward application of *Murphy*, 8 U.S.C. §§ 1373 and 1644 are not valid preemption provisions for the reasons set out in Defendants' Motion, as numerous courts have held. Mot. at

13–15 (citing cases). The United States's attempts to distinguish *Murphy* do not withstand scrutiny and are difficult to reconcile with the Opposition's own characterization of Section 1373.

The United States argues that *Murphy* does not apply to Sections 1373 and 1644. Opp'n at 16–18. First, the United States contends that Sections 1373 and 1644 "regulate[] aliens, not states." Opp'n at 16–17. But the text of these provisions belies that characterization. Section 1373 provides that "a [] State, or local government entity or official may not prohibit, or in any way restrict" certain communications concerning immigration status. 8 U.S.C. § 1373(a). Similarly, Section 1644 sets out that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [federal immigration officials] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644. Under *Murphy*, the relevant question is whether the federal law is "best read as one that regulates private actors." 584 U.S. at 477. Here, the operative prohibitions are directed expressly at state and local governments and their officials. That the provisions concern immigration does not change whom the statutes regulate. Nor can the United States portray the effect on states as "incidental[], Opp'n at 17, when the provisions purport to expressly restrict what state and local governments may do. Indeed, the United States's own argument that the Immigration and Nationality Act "might require a city or state to provide access to information on aliens," Opp'n at 18, underscores that these provisions regulate the states and therefore are not valid preemption provisions under *Murphy*.

Second, the United States emphasizes that, in *Murphy*, it was undisputed that regulating sports gambling fell within the states' police powers, whereas the federal government here has authority over immigration. Opp'n at 17. But the duties and responsibilities of state and local law enforcement have long been controlled by the states, not the federal government. *See* Mot. at 21–

22 (citing authorities). That the federal provisions broadly relate to immigration does not change their nature or who they regulate—states and state officials on police powers. Third, the United States suggests that *Murphy* applies only when a federal law directs a state to enact or refrain from enacting legislation. Opp'n at 17. But the Supreme Court's precedents make clear that the anticommandeering doctrine is not limited in this way. In *Murphy*, the Court described *New York*, which concerned a federal law that directed states to take title to radioactive waste. *See Murphy*, 584 U.S. at 471 (citing *New York*, 505 U.S. at 176). *Murphy* explained that the congressional order in *New York* had been directed "to either the legislative or executive branch of state government," and that "[e]ither way, the Court held, the provision was unconstitutional because 'the Constitution does not empower Congress to subject state governments to this type of instruction.'" *Murphy*, 584 U.S. at 471 (quoting *New York*, 505 U.S. at 176).

The United States also cannot avoid *Murphy*'s decisive impact on its claims because Sections 1373 and 1644 are not "positive command[s] to States and localities to allocate resources." Opp'n at 28. *Printz* explained that "even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects." 521 U.S. at 930. *Murphy* reinforced that distinctions between orders to regulate (which may involve state resource allocation) and orders to refrain from regulating (which likely would not involve state resource allocation) are "empty." *Id.* at 474–75. The United States's observation that the Tenth Amendment is not violated every time federal law consumes state or local employees' resources is beside the point. Opp'n at 28–29 (citing *Reno v. Condon*, 528 U.S. 141, 150 (2000)). Defendants do not contend that every expenditure of state resources, standing alone, creates a commandeering problem. Rather, the use of state resources here is one practical consequence of requiring Maryland officers to perform federal functions.

The United States misreads *Printz* as establishing that "even if 8 U.S.C. §§ 1373(a) and 1644 regulated states, they are still valid because they require only the 'provision of information' and 'do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." Opp'n at 28 (quoting *Printz*, 521 U.S. at 918). *Printz* did nothing of the sort. In *Printz*, the Court expressly declined to address the preemptive effective of provisions requiring only information-sharing, explaining that such laws "do not involve the precise issue before us here"; that the decision "do[es] not address these or other currently operative enactments that are not before use"; and that the Court would take up the question "when their validity is challenged in a proper case." *Id.* at 918. *Murphy* subsequently made clear that the relevant question for anticommandeering doctrine purposes is whether federal law regulates private actors or instead dictates what states may or may not do. *See* 584 U.S. at 474.

The United States's remaining arguments fare no better. It maintains that Section 1373 requires, "[a]t minimum," an individual's current addresses, employment status, custodial status, and date of release, among other things. Opp'n at 14. Yet, the text of Section 1373 does not contain these requirements, nor do the smattering of other federal statutes cited by the United States. *See id.* And many courts have held that Sections 1373 and 1644 cover only a person's legal classification under federal law and not any other information about the individual, *see* Mot. at 15–16 (citing cases), decisions with which the United States fails to engage. The United States tries to argue that the legislative history of Section 1373 necessarily points to congressional intent to broadly require information sharing. *See* Opp'n at 13–14. Regardless, "[i]t is 'the statute, and not the Committee Report, which is the authoritative expression of the law.'" *Rosmer v. Pfizer Inc.*, 263 F.3d 110, 117 (4th Cir. 2001) (quoting *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337 (1994)). The United States also takes issue with Defendants' argument that, if this Court holds

that Sections 1373 and 1644 are valid preemption provisions, it should construe the federal and state provisions to avoid a constitutional conflict. *See* Opp'n at 15–16; Mot. at 15–18. But it is well established that, "if a serious doubt of constitutionality is raised," a court must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoid." *Crowell v. Benson*, 282 U.S. 22, 62 (1932).

Finally, the United States argues that this Court should not apply the standard presumption against preemption to its express preemption claim. Opp'n at 18–19. As the Fourth Circuit has observed, "[t]he Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) (citing cases, including *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008), where the Supreme Court has applied the presumption against preemption "when the text of the pre-emption clause is susceptible of more than one plausible reading")). But whether the presumption applies or not, Sections 1373 and 1644 cannot be valid preemption provisions under *Murphy* because Congress cannot use preemption to regulate the states themselves.

**B. The Community Trust Act is Not Obstacle Preempted.**

As set out in Defendants' Motion, the Fourth Circuit instructs that "a court should not find conflict preemption unless preemption was 'the clear and manifest purpose of Congress.'" Mot. at 19 (quoting *N. Va. Hemp & Agric., LLC*, 125 F.4th 472, 493 (4th Cir. 2025)). The United States's Opposition establishes that its obstacle preemption theory cannot satisfy this demanding standard.

The United States identifies various provisions of federal law authorizing the use of administrative detainers, warrants, and subpoenas, *see* Opp'n at 5–7, 12, but none demonstrates a clear and manifest congressional purpose to preempt state laws that decline to honor these requests. Arguing for conflict preemption, the United States conflates Congress's interest in empowering federal immigration authorities to themselves enforce immigration law with the unsupported

suggestion that Congress also intended to displace state authority over the states' own officers. *See id.* The federal provisions authorizing detainers, warrants, and subpoenas do not establish the required conflict. As the United States concedes, a detainer is merely a "request[] that a state or local agency advise DHS prior to an alien's release." Opp'n at 5. A request, by its nature, contemplates that the requested party may decline to comply and therefore cannot establish a clear and manifest congressional purpose to preempt state law.

The United States's remaining arguments do not identify any federal requirement with which the Community Trust Act conflicts. At most, the United States shows that the Community Trust Act may make certain federal enforcement actions concerning individuals who are already in state custody less convenient or efficient. For example, the United States asserts that the Act's requirement of judicial approval before Maryland officials may honor administrative warrants, detainers, and subpoenas, makes immigration enforcement a "practical impossibility." Opp'n at 11 (quoting *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999)). Yet, it is undisputed that federal immigration authorities remain free to pursue detention and removal through the mechanisms Congress provided, without requiring Maryland's officers to assist.

The United States also says that Congress "clearly envisioned" that the federal government would be able to detain and remove unlawfully present individuals once their state proceedings and sentences concluded. Opp'n at 11. And, as described above, the federal government remains able to do so. However, no federal statute sets out any requirement that state officials *must* facilitate such a transfer, as opposed to releasing the individuals and leaving federal immigration authorities free to then detain and arrest. At most, the United States identifies an interest in making immigration enforcement more convenient or efficient, not the "clear and manifest purpose of Congress" required for obstacle preemption. *N. Va. Hemp*, 125 F.4th at 493.

The United States's invocation of authority over immigration does not change the analysis. *See* Opp'n at 3–7. The Community Trust Act does not regulate immigration or restrict federal immigration authorities. Rather, it regulates Maryland's state and local law enforcement officers and the circumstances in which state law authorizes them to participate in federal immigration enforcement. As explained above and in Defendants' Motion, the federal government's authority over immigration does not establish a concomitant power to dictate the duties of state officers.

**III. The Complaint Fails to State an Intergovernmental Immunity Claim.**

The United States's intergovernmental immunity claims likewise fail.

**A. The Community Trust Act Does Not Regulate Federal Immigration Authorities.**

The United States characterizes the Community Trust Act an "attempt[] to regulate the Federal Government's performance of its core federal function of enforcing immigration law by imposing state law requirements and conditions on federal officials beyond those required by Congress." Opp'n at 2; *see also* Opp'n at 19–22. However, that characterization confuses regulation of federal officials with regulation of Maryland officials. The Community Trust Act regulates only Maryland's state and local law enforcement officers and the circumstances in which they may participate in federal enforcement; it does not impose qualifications on federal officials, who are free to enforce federal immigration law in Maryland.

The United States relies on *Johnson v. United States*, 254 U.S. 51 (1920), to argue that the Community Trust Act unlawfully requires "qualifications in addition to those that the [Federal] Government has pronounced sufficient." Opp'n at 21 (quoting *Johnson*, 254 U.S. at 57). *Johnson* is inapposite. *Johnson* involved "an employee of the Post Office Department of the United States" who was "tried, convicted and fined for [] driving without having obtained a license from the State." *Id.* at 55. The Court held that "immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from

performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on." *Id.* at 57. In *Johnson*, a state sought to preclude a federal employee from performing federal functions on the ground that he had not satisfied state licensing requirements. The Community Trust Act does no such thing. Maryland has not attempted to control who may perform federal functions, through testing or fees or threat of criminal prosecution. Instead, Maryland has established when and how its officers may exercise state authority. Applying *Johnson* here would transform any state law that limits a state official's participation in joint activities with the federal government into an impermissible "qualification" on federal officers. Such a rule would be inconsistent with the anticommandeering doctrine.

Likewise, *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), does not support the United States's position. There, the Court found an impermissible direct regulation because Arkansas's licensing requirement subjected a private contractor to state regulation and gave the State "a virtual power of review" over the federal government's determination of contractor. *Id.* at 190. Here, the Community Trust does not purport to regulate the federal personnel or other nongovernmental actors on whom the federal government may rely to perform federal functions, except state employees and officials who derive their authority from state law.

The United States insists that the Community Trust Act "substantially interferes with federal immigration policy" and "fundamentally alters" how federal officials can access information. Opp'n at 21. But the upshot of the United States's argument is that a state's regulation of its own officers cannot leave federal-state coordination to anything but the federal government's preferred terms. That is not regulation of the federal government. Nor do *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2024); or other cases concerning state bans on private detention

facilities counsel otherwise. Those cases concerned willing private contractors who were purportedly prevented fully by state law from aiding the federal government. Here, Maryland has specified how it is willing to aid the United States in the sphere of federal immigration enforcement, but the United States demands more. The Supremacy Clause does not give the federal government the right to direct the duties of state officers or require Maryland to make its personnel available as an alternative source of hands for carrying out federal functions.

### B. The Community Trust Act Does Not Unconstitutionally Discriminate Against the United States.

The United States also fails to establish that the Community Trust Act unconstitutionally discriminates against and singles the federal government out for unfavorable treatment.

First, the United States seizes on portions of the Act that expressly refer to "federal immigration authorities." Opp'n at 22–23. But naming the entity with which Maryland officers may interact in the course of defining the role of Maryland officers does not transform the law into one regulating or unfavorably treating the named entity. Indeed, the Act's broader framework confirms that it does not disfavor federal immigration authorities. For example, the Act, as interpreted by Maryland's Attorney General, contains provisions that affirmatively clarify that state law does not prohibit state and local law enforcement from working with federal immigration authorities on joint criminal investigations. *See* Md. Code. Ann., Crim. Proc. § 5-104 (b)(3) ("Nothing in this subsection shall prevent a law enforcement agent from inquiring about any information that is material to a criminal investigation."); Md. Off. of the Att'y Gen., *Guidance Memorandum: Local Enforcement of Federal Immigration Law: Legal Guidance for Maryland State and Local Law Enforcement Officials* at 4 (updated June 2026) (hereinafter "AG Guidance")[1]

[1] The Guidance is available at https://oag.maryland.gov/FederalActionsResponse/Documents/pdfs/Law%20Enforcement%20Immigration%20Guidance%2006.22.2026%20Update%20%28FINAL%29.pdf.

(The Act "does not prohibit cooperation with [Immigration and Customs Enforcement] or other federal immigration authorities on criminal investigations, including criminal investigations undertaken through a joint task force."). The United States cannot establish discriminatory treatment merely by pointing to isolated limitations; it must show that the State has imposed a disadvantage on the federal government because of its federal status. The Act's broader structure undermines that claim and demonstrates that the law's purpose and effect is to define and clarify the authority of state officials.

The United States also contends that by "limit[ing] the functions of state and local officials to cooperate with the Federal Government[]," Maryland has regulated those "with whom [the federal government] deals." Opp'n at 23 (quoting *North Dakota v. United States*, 495 U.S. 423, 437 (1990) (plurality opinion)). Yet, the intergovernmental immunity doctrine traditionally concerns only the federal government and its contractors and similar private parties doing business with the government. *Cf. United States v. New Mexico*, 455 U.S. 720, 722 (1982) (presenting this intergovernmental tax immunity case as addressing a "recurring problem: to what extent may a State impose taxes on contractors that conduct business with the Federal Government?"). The United States does not cite even one case extending the doctrine to situations where a state purportedly discriminated against the federal government by regulating its own state employees.

The United States also still fails to identify any meaningful comparator. Opp'n at 24–26; *see* Mot. at 27 (describing the comparator requirement). It mentions two state criminal intelligence entities, Opp'n at 24 n.4, but to the extent those entities seek criminal investigative information, they are not treated more favorably than federal immigration authorities. Indeed, the Community Trust Act does not bar Maryland law enforcement officials from collaborating with federal immigration authorities on criminal investigations. *See* Md. Code. Ann., Crim. Proc. § 5-104

(b)(3); AG Guidance at 4. Thus, the federal government appears to have no more or less access to Maryland officers for criminal investigative purposes. The comparison is even weaker with respect to civil immigration information. The United States does not contend that either state entity ever seeks the information or actions that it demands of Maryland officials. Nothing identified by the United States suggests that these entities would, for example, issue immigration detainers, let alone have them honored by State officials.

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), also relied upon by the United States, does not suggest that no comparator is necessary. Opp'n at 25. *Boeing* concerned a California law that imposed a uniquely stringent cleanup regime on a federally owned site based on contamination resulting from federal activity, while generally applicable state environmental laws imposed lesser requirements on other sites. 768 F.3d at 842. The differential treatment was manifest; as the Ninth Circuit observed, "California does not dispute that 'SB 990 singles out Boeing, [the Department of Energy], [the National Aeronautics and Space Association], and the [Santa Susana Field Laboratory] site for a substantially more stringent cleanup scheme than that which applies elsewhere in the State." *Id.* Indeed, California defended the discriminatory treatment on the ground that the site was "especially contaminated." *Id.* *Boeing*, thus, did not eliminate the need to identify a comparator. It involved a state law where the state conceded that there had been discriminatory treatment and the comparators (i.e., other sites subject to the standard cleanup regime) were evident.

The United States also wrongly relies on *Genesis GSA Strategic One, LLC v. Howard County*, No. 26-cv-915, 2026 WL 2294479 (D. Md. Aug. 10, 2026). *See* Opp'n at 24, 26. In *Genesis*, a court in this District held that a Maryland county discriminated against a federal government contractor in violation of the intergovernmental immunity doctrine by revoking

building permits based on a state law that imposed requirements on the construction of an immigration detention facility for the federal government. The Court "d[id] not decide [the contractor's] claim based on direct regulation." *Id.* at *19. Also, the Court explained: "A discrimination claim cannot be used as 'an end-run around the Tenth Amendment' where a state has merely 'decline[d] to assist with federal immigration efforts.' . . . That exception does not apply here; this case does not involve a request by the federal government for the State of Maryland to 'assist with federal immigration efforts.'" *Id.* at *19 n.12 (citations omitted). This case is precisely the kind that the Court in *Genesis* contemplated, where an intergovernmental immunity claim must be carefully assessed in light of Tenth Amendment anticommandeering principles.

Finally, the Maryland General Assembly's decision to demarcate Maryland officers' role in federal immigration enforcement is not evidence of discrimination against the United States. It reflects Maryland's own interests in determining the duties and responsibilities of its officers, including with respect to federal functions. As *Printz* explained, when states are required to participate in the implementation of federal programs, regardless of whether they absorb financial costs, "they are still put in the position of taking the blame for [a program's] burdensomeness and for its defects." 521 U.S. at 930. If Maryland is required to implement federal immigration law on the terms the federal government demands, it may be Maryland law enforcement, "not some federal official, who will be blamed for any error (even one in the designated federal database) that causes" a mistake. *Id.* Such a holding would be inconsistent with the Tenth Amendment.

## CONCLUSION

For the foregoing reasons, the United States's claims should be dismissed.

Dated: September 3, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar No. 31472)
Adam Kirschner (D. Md. Bar No. 31767)
Lauren Gorodetsky (D. Md. Bar No. 32172)
*Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.maryland.gov

*Counsel for Defendants*